The first case on the call of the docket is Agenda No. 5, No. 124792, James Q. Whitaker v. Wedbush Securities, L.A. Ms. Jennifer Gedfield, please. Thank you. May it please the Court. Counsel. My name is Jennifer Gedfield, and I'm appearing today on behalf of the appellants, the estate of Dr. James Whitaker, and the Pathology Institute of Middle Georgia. We are here before you today on two issues. First, the interpretation and application of the scope of Illinois' UCC Article 4a and the method of authentication of a private website. First, UCC Article 4a. Stated simply, the appellee, Wedbush, accepted and acted on payment orders, in this case, wire transfer instructions, which were not authorized by its customers, the appellants. Because Wedbush did not have commercially reasonable security procedures in place to protect against unauthorized payment orders, over $370,000 of appellants' funds were transferred to accounts in Poland that did not belong to the appellants. Stated another way, a financial institution acting on behalf of its customer in a funds transfer without any security procedures in place. Section 204 of Article 4a provides what happens in these circumstances. The customers refunded the money that was transferred without their authorization. It seems simple enough. In the facts of this case, we have several factors. First, we have the hackers who sent an email with the unauthorized payment order to Wedbush, where the appellants had an account. Wedbush then accepted and executed this order by using its own customer portal at BMO Harris, where Wedbush had an account. BMO Harris further sent the unauthorized payment order through the banking system, where it ended up at MBank in Poland. The purpose of 4a is to address an activity, funds transfers, and the related rights and responsibilities of the parties in the series of transactions. Article 4a, Section 102, states that subject matter is as it applies to funds transfers, which is defined in Article 4a, Section 104. 104 defines the funds transfers as a series of transactions made for the purpose of making payment to the beneficiary of the order. Funds transfers includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. So breaking down how a funds transfer begins with the originator's payment order. 4a.104 defines originator as the sender of the first payment order in a funds transfer. Here, the first payment order was sent via email by the hackers purporting to be the appellants. So they are the originators as the sender of the first payment order. 4a.103 defines sender as the person giving the instruction to the receiving bank. So the hackers purporting to be the appellants are also the sender, as they are the ones sending the instructions. 4a.103 defines payment order as an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay or to cause another bank to pay a deferrable amount of money to a beneficiary. Here, the instruction of the hacker to Wedbush by email to make the payment order to the hackers' accounts in Poland is the payment order. Wedbush accepted and executed their instructions and payment order. Doesn't this boil down to statutory interpretation of whether Wedbush is a bank? Yes, it does. That is what the lower courts ruled. They were focused on what is Wedbush engaged in the business of banking. And in order to, as you all know, to interpret the statute, one of the things was to go back through the facts of this case and the definitions that apply here and the roles that each of the actors in this situation played. And I think by doing that, we can see clearly that the role that Wedbush is playing is they are acting as the receiving bank. They're acting as the originator's bank. And I think the statute itself does imply in a negative way, when you look at some of the comments, that if you are doing the things under the statute, if you are engaged in funds transfers, if you are taking these actions on behalf of your customers, then you are a bank. You know, Wedbush has argued that they were just an agent. But if that was the case, they would not have been asking BMO Harris to process a wire transfer or funds transfer out of Wedbush's own account. They would have been asking to process a wire transfer out of the appellant's account. But the appellants don't have an account at BMO Harris. The appellants are not a customer of BMO Harris. They are a direct customer of Wedbush. And Article 4A in the definition in Section 105 defines customer as a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders. And that is our situation here. Wedbush agreed to receive payment orders from the appellant. Wedbush is BMO's customer and the appellants are Wedbush's customer. Now BMO is part of the series of transactions, but they are acting for Wedbush and not for the appellants. They are considered an intermediary bank in the series of transactions. So this makes Wedbush both the receiving bank and the originator's bank. The receiving bank is the bank to which the sender's instructions are addressed. Here the hackers addressed the instructions and sent them directly to Wedbush. What the originator's bank means, the receiving bank to which the payment order of the originator is issued. So while it seems like there are multiple definitions for the same things, there can be different actors in that under these definitions. But in our case, we have one actor acting as both the receiving bank and the originator bank. Because the sender, the originator, the hackers sent it directly to Wedbush. And Wedbush's argument that they were just an agent and not either of these things fails. They accepted the payment order. They executed the payment order. And they did this because they directly received the unauthorized payment order. They accepted and executed it by taking several actions to do this. Wedbush's own employees went through and they checked first to make sure that the appellants had funds available in their account at Wedbush to make these transfers. They also had various back office procedures. But more importantly, in this case, Wedbush's own employees changed the erroneous instructions of the hackers where the hackers had gotten the information wrong. Wedbush's employees corrected it and then entered that information into their customer portal at BMO Harris. So how does Wedbush be considered as having accepted the payment order? A receiving bank, other than the beneficiary's bank, which is the person at the end of the series of transfers, accepts the payment order when it executes the order. Comment number one to Article 4A, Section 209, which defines acceptance, says that the section treats the sender's payment order as a request by the sender to the receiving bank to execute or pay the order. And that request can be accepted or rejected by the receiving bank. Here, a total of eight unauthorized payment orders were sent by the hackers to Wedbush. Wedbush accepted four of the unauthorized payment orders and they rejected four of the unauthorized payment orders. So when does execution occur? When the receiving bank issues a payment order intending to carry out the sender's order. Wedbush issued its payment order to BMO, intending to carry out the unauthorized payment order of the hackers. 4A simply applies to financial institutions acting on behalf of its customers in funds transfers. Wedbush's acceptance of the payment order and execution by acting on the payment order makes them the receiving bank and the originator's bank. And further, they are a bank by definition under 4A itself. Article 4A, Section 105, defines bank as a person engaged in the business of banking and includes a savings bank, savings and loan association, credit union, and trust company. So what does this really mean in the context of 4A? Looking to several of the comments to 4A and the policy of the UCC itself are helpful. Comment number one to 4A, Section 105, reminds us that in addition to what we all traditionally think of as commercial banks, as explained in the comment, 4A was drafted to recognize that when it came to funds transfers, financial institutions that are not traditionally considered commercial banks were now performing functions that previously were restricted to typical commercial banks, including the activities that are the subject matter of 4A when the subject matter is funds transfers. Comment number one to Article 1, Section 103, which talks about the construction of the UCC in general, says that the uniform commercial code is drawn to provide flexibility so that it is intended to be a semi-permanent and infrequently amended piece of legislation. It will provide its own machinery for expansion of commercial practices. Counselor, is it your position under 4A, the comment, that funds transfer is a litmus test and that's all we need to know? Are there other factors as to whether they're a bank or acting or engaging in the business of banking? Well, there are other factors that 4A provides itself. It's not an unlimited thing. The activity governed by 4A is funds transfers. So we look first, obviously, to the activity. Within the definitions of 4A itself, it relates to, you know, explains how the parties can be part of this series of transfers and the different actions that can be taken. And also, it also says in the comment to Section 104, talks about how a bank is defined in Section 105, and it says that the effect of that definition is to limit 4A to payments made through the banking system. So the comments in this case provide, I think, some of the best guidance for what was the intent here. Because it also says in that comment that a transfer of funds by an entity outside of the banking system is excluded. So we have a funds transfer that's taking place within the banking system. And clearly, that's what we have going on here. We have a payment that is being made through the banking system. And if the focus is limited to payments being made through the banking system, it's focused on the banking system and the activity. The comment goes on to say that a transfer of funds by an entity outside of the banking system is excluded. And so how is Wedbush an entity outside of the banking system in this case? They're not, because the comment goes on to say, this is to comment number two to Section 104, that a transfer of funds through an entity other than a bank is usually a consumer transaction, involving relatively small amounts of money in a single contract carried out by transfers of cash or cash equivalents, such as a check. And that description doesn't fit our case at all. This is not a consumer transaction with small amounts of money. It's not a single contract carried out in cash or check. Wedbush provides wire transfers as an ongoing service to its customers. If you think about the facts and circumstances being described in the comment, you come to the conclusion that the drafters are indicating that entities using the banking system to transfer funds are banks under 4A. Wedbush is using the banking system to transfer funds for its customers, and therefore it is a bank under 4A. It's Wedbush's choice to provide wire transfers as a service to its customers. They don't have to do this. The prefatory note to Article 4A contemplates that some entities may not want to offer funds transfers as a service. And the prefatory note says, that substantial risk is involved in funds transfers to all customers, and certain banks may not be willing to give this service to all customers. They might be willing to offer it to any customer unless certain safeguards against loss, such as security procedures, are in effect. The trial court found that in order to conclude that Wedbush was a bank for the purposes of 4A, it requires a high level of involvement in customers' finances, usually including checking, deposit, withdrawal services, and in some circumstances, debit and credit cards. There's no such standard in 4A or in the commons to 4A, and there's no such standard in any of the cases applying 4A. The appellate court perpetuated this conclusion by finding that they could not conclude that Wedbush was engaged in the business of banking, and therefore subject to a 4A. The appellate court said there was no admissible evidence indicating that Wedbush offered checking services, that Wedbush offered deposit accounts and loan services, or that they wrote checks out of appellant's accounts, and that appellants did not elucidate how that activity would constitute the business of banking. The appellate court said they reviewed the record, the UCC, commons, and case law, interpreting Articles 3 and 4 and 4A, but really all of the evidence they say they wanted to see indicate that Wedbush was engaged in the business of banking. There are activities under Articles 3 and 4, activities that would subject you to Articles 3 and 4, not activities under 4A. Historically, the attempt to define the rights and obligations of funds transfers by general principles or analogy to the rights and obligations under negotiable instrument law or the law of check collection were not satisfactory. So in drafting Article 4A, a deliberate decision was made to write a clean slate and treat a funds transfer as a unique method of payment to be governed by unique rules and address the particular issues raised by this method of payment. There are competing interests. Banks that provide the funds transfer services and the commercial and financial organizations that use them. And the competing interests were represented in the drafting process and they were thoroughly considered. The lower courts in Wedbush would have you rely on Article 3 and 4 cases to interpret the definition of bank under 4A. But it makes little sense in light of the purpose of Article 4A. If those cases have any value, it is that they can be used to provide an analogy to the activities that they cover, the activities that occur under 4A being funds transfers. Of course, cases under Article 3 and 4 state that a key factor is providing checking services and deposit accounts because that's what those articles apply to. Those are the activities being covered by those articles. So an analogous statement would be to say that the key factor in applying Article 4A is whether or not funds transfers are involved. Those are the activities being covered by Article 4A. It's not check writing services. It's funds transfers. Beyond that, relying on Article 3 and 4 cases would be relying on the principles for the very same articles that the UCC committee found were inadequate to address the principles for funds transfers and that's why 4A is to exclusively govern funds transfers. Wedbush is a bank for purposes of 4A. Acts on behalf of its customers and funds transfers within the scope intended by 4A. What is included in the definition of bank should be as intended by the drafters. Using an intentionally broad interpretation, the definition is meant intentionally to be inclusive. 4A includes financial institutions that are not commercial banks and includes those performing functions previously restricted to commercial banks, including acting on behalf of customers and funds transfers, including making those payments through the banking system, including those involved in the activity within the scope of 4A. This case is the reason Article 4A exists. And to agree with the lower court's determination and Wedbush's position would create a precedent in Illinois that an entity using the banking system offering wire transfer services to its customers is not subject to 4A, which renders the result contrary to the intent and plain language of 4A. Ms. Getfield, if we were to affirm the appellate court, would plaintiffs be totally without a remedy? In this situation, yes. If Wedbush is not receiving an originator bank as part of this series of transactions, there's no remedy under 4A. The appellants are not a customer of BMO. There was no action against BMO. BMO's relationship with Wedbush is, they had security procedures there. I know the appellee has various arguments that there were all these other ways that we could have, we had other remedies and things we could have done. But if you break them down one by one, that's not really the case. 4A preempts and states that it preempts other actions as long as it's covering the same topic. So that takes out breach of contract. Maybe fraud cases could be pursued. But in our situation, we were unsuccessful obviously on that point as well. Negligence is not a workable cause of action. Breach of fiduciary duty, the appellees even claim that they don't have a fiduciary duty. So to argue that we should have been suing for breach of one, and the regulations that they cite that govern FCMs like Wedbush, they didn't have an action that worked either. So without using 4A, there's nowhere for our person to recover. But isn't the preemption under 4A apply only if Wedbush is a bank? Yes, that would be correct. Our second issue before you today is the authentication of a private website. And this refers to Plaintiffs' Exhibit 11 and the ways in which a private website can be authenticated for admission into evidence. Plaintiffs' Exhibit 11 was a printout from Wedbush's website listing their banking services. And it was properly authenticated at trial because it bared the URL, which stands for the website address, and the date. And there was testimony about the viewing of it and the printing of it by Dr. Whitaker. The point, obviously, of authentication is to make sure that we have evidence sufficient to support what it is we're trying to have admitted as evidence. And Rules of Evidence 901B4 speaks to distinctive characteristics. Here we have a URL, we have a date. B1 talks about testimony of a witness with knowledge. Dr. Whitaker was the person who viewed it and he printed it. If you're concerned there's a risk of falsification, this is a website. This isn't the social media account that's been addressed. And so we ask that you... We respectfully request that you reverse the lower court's decisions as to both Article IV-A applicability and mission of Plaintiff's Exhibit 11. Thank you. Mr. Henderson. Good morning. This is the Court Proposal Council. My name is Jeff Henderson. I'm on behalf of Wedbush Securities myself and I've had the cause appear today. The first question before the Court is whether in December of 2014 Wedbush was engaged in the business of banking under Article IV-A Bill, Illinois Uniform Commercial Code. In many respects, this case is all about the evidence. So I'm going to begin by talking about the evidence. Both the Circuit Court and the Appellate Court found that there was no admissible evidence that Wedbush offered any services that would cause either court to conclude that Wedbush was engaged in the business of banking. The evidence in this case revealed that the services provided by Wedbush concerning Whitaker's commodity trading accounts was in fact confined to carrying out Whitaker's trading instructions and Whitaker's instructions to wire money. Are you saying that this was not funds transfer? That there were no funds... As a term of art, this is not a funds transfer case? No, we acknowledge these were funds transfers. I'm saying that the evidence that both courts found to be admitted... The evidence the courts relied upon were really two categories of evidence. Trading activities and the funds transfer activities. So there were funds transfer activities? Yes, there were funds transfer activities. So IV-A would apply? Potentially. That's what we're here to argue about. Whether it applies or not. Whether Whitaker should be considered to even be in the business of banking under IV-A. So the evidence also confirms that Wedbush's registries were heard as a futures commission merchant over an FCM at the CFTC that had maintained a customer-segregated account of BMO Harris to hold, receive, and disperse customer funds, which is the activity of an FCM. And that Wedbush forwarded Whitaker's wire transfer requests to BMO Harris, which then processed and executed those requests. The procedure utilized by Wedbush was no different than the activity of other FCMs in the business and many financial institutions that provide wire transfer services for their customers that are nonetheless not banks nor engaged in the business of banking. Contrary to Whitaker's allegation that Wedbush functioned as the receiving bank and the originating bank for the wire transfer requested issue, in reality, Wedbush functions as Whitaker's agent. In his capacity as his agent, he had a duty to forward his wire transfer request to BMO Harris, provided that his accounts maintained sufficient funds. There is no dispute in this case that Whitaker's accounts at Wedbush had funds sufficient to honor those requests. This agency relationship that I'm talking about was no different from the agency relationship that Whitaker and Wedbush enjoyed with respect to the execution of trades that I mentioned a moment ago. Whitaker would forward his orders or requests for the execution of trades and Wedbush would route those orders to the appropriate commodity exchange and arrange for the execution of those trades and then report it back to Whitaker about the fills on those trades. At no time did Wedbush act as a bank with respect to Whitaker's wire transfer request. Whitaker's argument on appeal was probably best encapsulated in page 21 of his opening brief where he claims that, quote, Wedbush acted as a bank under Article 4A because it processed numerous wire transfers. Processing wire transfers doesn't cut it. This argument has no factual support for several reasons. First of all, Wedbush is not a member of the Federal Reserve. Number two, there's no evidence that it was registered as a bank, say it was a loan or a trust company. And the funds at issue that we're talking about were actually held by the depository bank, BMO Harris, not by Wedbush. And only Harris, only BMO Harris, could effectuate the wire transfers. Could you help me? I am struggling a bit. Sure. You were concerned about the role of agent. What I'm concerned about is comment one, and I notice that you don't discuss that link anymore, but comment one is a definition of bank, which seems to be the key here. And the definition reflects the fact that many financial institutions now perform functions previously restricted to commercial banks, including acting on behalf of customers in funds transfers. At least reading the language here, it seems that the comment is linking the definition of bank to acting on behalf of customers in funds transfers. Why is that not the correct interpretation of that comment? Well, you have to go one step further. In order to be deemed to be in the business of banking, you have to engage in some type of traditional banking activity. And this is where the circuit court and the appellate court honed in on what actually happened in this case. What was the evidence? And the evidence was that Wedbush never offered any traditional banking. But doesn't the comment say exactly the opposite? The definition reflects the fact that many financial institutions now perform functions previously restricted to commercial banks. So doesn't the comment suggest under 4A that the definition is going to be broader? Correct. But as I mentioned a moment ago, Your Honor, you have to go further to determine whether you're ensnared under 4A depending on the activity that you actually engage in. And we're saying in this case both courts unequivocally held that we didn't engage in any additional activity that would put us under the purview of 4A. Did you act on behalf of customers in funds transfers? To the extent we carried orders from customers to BMO Harris to effectuate those transfers. We didn't offer or provide check writing services, debit or credit card services, or any traditional services. All these courts that look at this issue have said are necessary in order to cross the transit. Mr. Henderson, when Dr. Whitaker opened his initial, I don't know what you refer to it as, arrangement account with your client, presumably something was signed that involved the future commissions merchant role that you played. Correct. Was there a disclaimer in that about what they could do and not do? There was not. Is that in the record? It was. On this particular issue, there was no disclaimer. If I understand the question correctly. Right. Okay. Thanks. The other evidence that I'm going to point the court to is the testimony of BMO Harris' own employee, Megan Kells. Megan Kells testified that Wedbush was a financial institution group or FIG client. She further testified that FIG clients are clients who are regularly involved in the depositive funds and wire transfer funds for their non-customers, but that we, BMO Harris, did not believe that Wedbush was acting as a bank or transacting business as a bank. That was the evidence in this case. There's no dispute that Whitaker, undeniably, albeit through a criminal hacker, sent requests for wire transfers to his intermediary agent, Wedbush, who thereafter, as a prior practice, carried those requests to BMO Harris, which was a customer-side depository account utilized by Wedbush. We believe the evidence in this case confirms that Wedbush, that BMO Harris and not Wedbush, acted as both a receiving bank and the originator bank, as those terms are defined under Article IVA. Although we recognize that Illinois courts previously ruled on this issue, courts in various jurisdictions across the country have been asked on numerous occasions to determine whether non-bank financial institutions such as Wedbush are engaged in the business of banking under the Uniform Commercial Code. In the context of IVA? Yes. As the appellate court observed, quote, these courts have concluded that a key factor in a determination with respect to whether that entity is a bank is whether it offers checking services. In this case, it's indisputable that Wedbush never offered Whitaker check writing services on Whitaker's respective commodity trading accounts, nor is there any evidence that Wedbush offered check writing services to its customers at large, either its commodities customers or securities customers. Whitaker is contending in this case that because the case is relied upon by the lower courts, it goes under Articles III and Article IV of the UCC rather than Article IVA, that they're irrelevant and should not be considered. However, Whitaker cites no authority for this proposition, and in fact it conflicts with the fact that the definition of the bank that is found in Articles III and IV is the same definition that's found in Article IVA. In fact, definitions of bank in Articles III and IV specifically reference the definition of bank in Article IVA, and the official comment to Article IVA states, quote, the definition of bank is added and is in conformity with that found in Section IV, Section 1 and 5A2. So the fact that the definitions of bank are the same in all three articles and that the official comments explicitly make it clear that they were intended to be the same, we think undermines and nullifies their argument that the definitions and the respective applications were intended to be treated differently based on the type of transactions that were addressed in each particular article, III, IV, and IVA. The other thing that we think is noteworthy is that Whitaker mischaracterized the appellate court's decision in this case as requiring check writing services in order to be a bank under Article IVA. This mischaracterization began in Whitaker's petition for leave to appeal, where they incorrectly state that the appellate court, quote, concluded that check writing services were required to be considered a bank. This is simply false. In reality, the appellate court stated that, quote, courts had concluded that a key factor in the determination that an entity is a bank is whether it offers check writing services. To follow up on Justice Tice's questions earlier, is it your position, and I'm going to get two senses from your argument, is it your sense or is it your argument that, based on the comment in 45408-105, that you are not acting on behalf of customers in fund transfers or that you have, if you did act on behalf of customers in fund transfers, there has to be something additional done in the way of banking services? It's the latter. There has to be something additional. Every court is uniformly set. There has to be some other traditional banking services rendered by the financial institution that was involved in the handling of wire transfers with customers. But this comment doesn't seem to say that. No, but correct. The case law interpreting this issue, cases interpreting this issue all say that, without exception. Could you cite me the case that you're saying that interpreting this comment, this provision, in the case that this is not a bank. What case are you relying on? You say all the cases say this. Which one? The cases that we cited in our brief. I don't have the list in front of me, but there were four or five different cases. I don't have them in front of me. But I'll stand for the proposition that in the absence of a traditional banking service having been offered, there will not be a finding that you're engaging in business with a bank. This is Article 4A. Are these the cases of Borchers and Edward Jones and Woods and Asian International? Those are in your brief, and you say those cases arose under Article 3 and 4. Are there other cases that you can cite to us that deal, as you say, do all the cases support your position that in 4A, how we were to interpret that section? Are there any cases that specifically deal with 4A? Not that we've found. So all the cases don't support that position? All the cases we've cited under Article 3 and Article 4 support your position? I'm sorry. So we think at the end of the day, it all comes down to what the winning court was able to show or demonstrate at the trial court with respect to these other traditional check writing services that may or may not have been offered in December 2014. The circuit court found that there was no proof that Wedbush offered checking, deposit or withdrawal services, or a number of credit card services. The appellate court found no admissible evidence in the record demonstrating that Wedbush offered checking services, deposit services, or loan services, or any other activity that would constitute the business of banking. Essentially, we find that we processed his request as his agent and carried his request to VML Harris. Whittaker's briefs in this court simply fail to point to any admissible evidence that would indicate or suggest that Wedbush was engaged in the business of banking in December of 2014. Whittaker's trial Exhibit 11 was ruled an admissible by the circuit court. The only other activities that Whittaker pointed to in support of his position that we were engaged in the business of banking was the fact that a customer could deposit or withdraw funds from his or her account and that Wedbush correspondingly deducted fees and taxes from those accounts for those services. Respectfully, those are highly transparent distractions and they don't begin to give the rise to the level of traditional banking activities that would bring Wedbush under the purview of 4A to be deemed to be in the business of banking. The cases that Whittaker relies on in this manner primarily involve Maryland's broker deal. As the appellate court noted, those cases contain minimal analysis in support of the court's conclusion that Merrill Lynch was a bank. The reason for that should be lost in this court. Merrill Lynch embraced in those cases the finding that it was a bank because the finding that it was a bank allowed it to invoke the one-year schedule proposed under the Banking Act and block the claims. There was never a dispute by Merrill Lynch whether it was or wasn't a bank. It embraced that because it allowed it to block the claims. And the analysis in those cases, if you look at those cases carefully, they don't even analyze the issue of whether it was a bank. They just accept the issue, accept it as gossip for all practical purposes. So what this all boils down to is the position in this appeal is that their position is that Wedbush should be considered a bank for purposes of Article 4A because it was involved in funds transfers. The appellate court correctly rejected this flawed argument in finding that if the processing of wire transfers was sufficient in and of itself to place a financial institution within the parameters of Article 4A, the definition of a bank would not be necessary. Article 4A was intended to apply to all wire transfer servicing. It would have defined a bank as any financial institution involved in wire transfer servicing. It did not do that. This means that something more than mere involvement in funds transfers is required to be deemed to be engaged in the business of banking. Put another way, the definition of a bank under Article 3.4 of 4A does not include all financial institutions that are involved in wire transfers. In fact, in the absence of offering additional banking services such as check running, a financial institution that is merely involved in wire transfers is not a bank. It's the Congress. So we believe the court's blow did not err by concluding that a financial institution must engage in traditional banking activities in order to be found to be a bank for purposes of Article 4A. Out of curiosity, what happened with BMO? BMO accepted Roy Bush's request to wire the money, actually wired the money to MBank in Poland, which is where the hacker had opened up accounts in the operator's name. Was there an action taken against them? There was not an action taken against MBank. However, we assisted Dr. Whitaker to some degree in cooperating with the Polish authorities to recover $150,000. So they got some of this money back. Do you agree with opposing counsel that there were no other causes of action that she could have pursued besides 4A? I do not. May I briefly address that? Sure. So I think the question was asked, by one of your honors, whether preemption applies and the answer was only if 4A applies. But that's not actually true. It's forth in our brief. Whitaker had other claims in this case. He actually advanced one of those claims, the fraudulent concealment claim. That claim was dismissed by way of motion for summary judgment. It was abandoned and appealed. However, Whitaker had other claims, such as claims for breach of fiduciary duty, breach of contract, and conversion, which courts specifically held, as we said in our brief, are not preempted by Article 4A. Both the Regents Banks cases, as we cited on page 25 of our brief, the preemption is inapplicable to these claims. So no, Whitaker was not without remedy. In fact, you can take it one step further. He could have brought claims in arbitration before the National Futures Association, which is a self-regulatory body established by the CTC. He could have asserted claims to violation of the anti-fraud provisions under Section 4 of the Commodities Exchange Act, either a reparations action at CTC or in federal court. And so the bottom line is, a ruling in favor of a web wish, in this case, on the 4A issue, simply would not deprive Whitaker of any remedy at all. He had lots of other choices or claims he could have pursued, but apparently elected not to pursue them. So that takes us to the second issue, which is the admissibility of Exhibit 11, or the denial of the admissibility of Exhibit 11 at the trial level. Whitaker's claim on appeal is that this was an abuse of discretion. The authentication requirement for website printouts has been well-developed by the federal courts. There's only one case in Illinois that talks about this issue, and it deals with website excerpts from social media. It's the Ken, People v. Ken case. But as I said, it was well-developed by the federal level,  It's been well-developed by the federal courts. There are no website printouts. Whitaker contends that he properly authenticated the files of Exhibit 11 because Dr. Wood testified that he printed the web pages and the URL matched. There was a URL and the date was shown on the document. He has no knowledge of that website. Case law is clear that the webmaster or the employee with knowledge of the website needs to testify that it's the website that it purports to be. I'm out of time. Thank you very much. The litmus test here, if we're looking for one, is funds transfers. Funds transfers taking place within the banking system. Entities using the banking system to transfer funds are banks under 4A. So while the case law has not been helpful in defining what a bank is, the statute itself is helpful enough. The Article 4A, Section 105, the comment provides that it's intended to apply to financial institutions that are not traditionally seen as banks. While that is actually the case in this situation here too, we have to make sure that the Uniform Commercial Code continues to be a living, breathing, changing thing. That's what they intended it to be. They wanted to make it possible for the law to continue to be applied in the light of new and unforeseen circumstances. I think everyone would agree that what constitutes traditional banking has been changing especially in the last 5-10 years and will probably continue to change in the next 5-10 years. Wedbush, their agency argument just doesn't work here. They accepted and executed these payment orders. It wasn't just, oh, here's the payment order, we send it through. They reviewed it. They rejected some of them because the beneficiary was listed as not as who they had on their account. They sent it through three different departments for verification. This wasn't an agency situation. This was them actively acting on these payment orders. BMO had no visibility to these wire transfer instructions that came through from the appellants or in this case the hackers. They never saw that. All they got was the information that Wedbush put into the customer portal at BMO Harris and that was based upon Wedbush's determination, their acceptance of the payment order. They're the ones that decided whether it went forward or not. In this case, they rejected four of them. Unfortunately, further educating the hackers about how to do it correctly and then also, like I mentioned before, correcting some of their errors on the IVAN and the account numbers and things like that. The cases under 4A don't mention checking services. We wouldn't be here today if we had a lot of cases interpreting 4A in lots of different ways. In 4A, it's always difficult when the term being defined is used in the definition. Bank means a person engaged in the business of banking. But would you agree that the list here is not exclusive? It includes a savings bank, savings and loan association, credit union, and trust company, so there could be others. Right, and my understanding is those specific types of entities were added because there had been prior cases where those entities had argued they were not acting as banks. Okay. And so that was why they were added. So if I would understand Mr. Henderson's argument correctly in the comments section where it says including acting on behalf of funds transfers, that's not exclusive also. So it could mean there should be other factors taken into consideration in determining whether it's a bank. Including is not exclusive. Including is not exclusive, but it's also meant to be inclusive, to include multiple types of entities is what we argue here today. And as not being exclusive, I think the definitions in Article 4A and the comments to them themselves provide us with a definition in a sense by a negative, that when they're talking about if you're an entity using the banking system for funds transfers, that makes you a bank. And so that's what we have here. The argument that the definitions are the same definition of bank in 3 and 4 and actually in Article 1 and Article 9, everybody started at the same place, but we wouldn't need those to be in each place if the bank definition was meant to be the same. That's why when we're looking at it, we look at the activities that are covered by each of those sections. The activities under 3, the activities under 4. If I'm an institution and I'm only acting on wire transfers, am I a bank under Article 3? I don't offer check writing services. I don't have deposit accounts. So that's why there are the same definitions repeated over and over because it's meant to be a starting point that then be applied to the activities under that particular article. Your opposing counsel in briefing said if the decision would be reversed or there should be a remand to the circuit court. What's your response to that? We don't believe that that is necessary at all in this case, in particular because at the trial court level, all of the underlying issues were tried. And even the next steps that you would take if we got past the point of the applicability of Article 4A, all of the evidence was in the record about whether or not there were any security procedures, let alone commercially reasonable security procedures. Whether or not a procedure was commercially reasonable as a matter of law, as stated, not a question of fact. We don't really have any fact questions. And obviously there are situations, as we've referred to, where this court obviously has the ability to decide all the matters before because everything is in the record. I just wanted to make one comment about the Merrill Lynch wanted-to-be-a-bank concept. If we look at the four actual 4A cases that we're talking about, we have really three of them involving Merrill Lynch. Asian International, which was a case, an Article 3 case, before Article 4 even existed. Covina 2000 in gold. And while it's true to say that Merrill Lynch didn't argue about not being a bank, the other side did. In Asian International, the plaintiff argued that they were not a bank. And in gold, they definitely argued about whether or not a bank. So while the courts didn't go into detail as to why they found Merrill Lynch was a bank, they accepted the proposition with the ponent's argument that they had to determine, yes, they were a bank. They just don't expound on it, unfortunately. The Covina case, there wasn't an argument on either side about whether or not Merrill Lynch was a bank. And they wanted to obviously use the remedies under 4A for people who follow security procedures. But in that case, it just didn't become an issue. So we don't have any further information that comes out of that case as well. And then with respect to a lot of their rebuttal points, there is evidence in the record that if the court didn't want to find the more broader rule that 4A applies, as we were saying, if you have to find some additional activities or services, they say they didn't offer check writing services. Obviously, Exhibit 11 is admitted. That would make a big difference for us. But even without that, their own exhibits talk about their ability to wire funds and write checks out of their customers' accounts or on behalf of their customers. There are a lot of other things in the record that talk about their traditional banking services. People have deposited into accounts with them. They did all the statements. They did all of those types of activities that would make you seem that they are acting in other ways other than just wire transfers. And what BMO Harris's employee, who is in the record stated as not being an expert, decided they internally called, Wedbush, is really irrelevant. That person testified that they didn't have any familiarity with the definitions or meanings of the definitions in Article 4A. So that is also additionally not really relevant here. And with respect to the remedies, as I stated before, we can name all of the things that Wedbush does in FCM, all the regulations they're subject to, but when you actually look at those regulations in order to bring a clause of action under them, we don't meet any of those standards. You know, breaching of fiduciary duty, which Wedbush vehemently denies they even have, let alone that they've breached it. But the levels of acting, they're all situations of fraud or bad acting or things like that. Not the clear situation here where 204 provides what happens when an unauthorized payment order comes through and the remedies that are available. If there are no further questions. Thank you. Thank you. Case number 124792, Whitaker v. Wedbush, will be taken under advisement as Agenda Number 5. Mr. Henderson and Ms. Skedville, thank you for your arguments this morning.